Filed 2/28/22  Green v. Suzuki CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| GABRIEL GREEN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DANIEL SUZUKI et al.,<br><br>    Defendants and Respondents. | B295980<br><br>(Los Angeles County<br>Super. Ct. No. EC063893) |

APPEAL from the judgment of the Superior Court of Los Angeles County, William D. Stewart, Judge.  Affirmed.

Gabriel Green, in pro. per., for Plaintiff and Appellant.

Schmid & Voiles, Denise H. Greer, Michael V. Lamb and John S. Cayley for Defendants and Respondents.

————————————————

Gabriel Green appeals from a judgment entered after the trial court granted the motion for summary judgment filed by defendants Daniel Suzuki, M.D., and San Marino Psychiatric Associates (SMPA), in which Dr. Suzuki is a partner.  Green brought claims for professional negligence, abuse and neglect of a dependent adult, and intentional infliction of emotional distress alleging Dr. Suzuki and SMPA failed to provide adequate care to Green while he was involuntarily committed to the Aurora Las Encinas Hospital (LEH) under Welfare and Institutions Code section 5150.[1]  The trial court concluded Dr. Suzuki and SMPA carried their burden to show Dr. Suzuki's treatment of Green was within the standard of care and did not cause Green's injuries.  Green submitted no evidence in opposition, and the court granted the summary judgment motion, finding Green failed to meet his burden to raise a triable issue of fact.

On appeal, Green contends the trial court erred in determining Dr. Suzuki and SMPA carried their initial burden to show that Green could not establish the elements of his causes of action as alleged in the operative complaint, and even if Dr. Suzuki and SMPA carried their burden, there are triable issues of fact.  We affirm.

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.  Section 5150 authorizes peace officers and certain mental health professionals to hospitalize persons perceived to be a danger to themselves or others for a 72-hour mental health evaluation.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Complaint*

Green filed this action on June 12, 2015 against Dr. Suzuki, SMPA, LEH, and others.  Green's operative corrected second amended complaint alleged causes of action against Dr. Suzuki and SMPA for professional negligence, abuse and neglect of a dependent adult, and intentional infliction of emotional distress.[2]

Green alleged that on March 13, 2014 he was evaluated for chest pain at UCLA medical center.  The treating physicians determined the pain was likely caused by anxiety.  Green had a history of mental illness, including major depression.  Due to a bed shortage, Green was told he would need to transfer to another hospital for psychiatric treatment.  Green requested a transfer to LEH because of its excellent reputation and because he had been a patient there in 2007.  Dr. Noble, a psychiatrist at UCLA medical center, told Green the transfer to LEH was more likely to be approved if Green were suicidal because admissions for involuntary commitments under section 5150 were given priority by LEH.  Dr. Noble placed Green on a 5150 hold.

Green was transported by ambulance and admitted to LEH.  At the nurses' station, a mental health worker named

---

[2]    Green alleged causes of action against LEH and the other defendants for "[h]ospital [n]egligence," negligent retention and supervision, violation of Civil Code section 56, violation of Welfare and Institutions Code section 5328, public disclosure of private facts, invasion of privacy, negligence, and battery.  LEH and the other defendants are not parties to this appeal, and those claims are not before us.

3

Chris asked Green to turn over his cell phone. Green told Chris he needed his phone to conduct business by text and email, but Chris took his phone. Chris told Green, "'Anytime you need to use your phone, just come to me and I'll let you use it here in the nurses' station.'" Green signed an agreement with LEH that provided LEH's rules and regulations, but Green struck out the language limiting his use of his cell phone and requiring him to relinquish it to hospital staff.

By this time Green was hungry because he had not eaten since lunch, and he asked Chris for dinner. Chris stated the kitchen was closed, but at 3:00 a.m.—at least four hours later— Chris brought Green a ham sandwich. Green started to eat the sandwich, but he could taste that the mayonnaise and cheese in the sandwich had spoiled.

When Chris escorted Green to his room, another patient was asleep in one of the beds. Chris told Green to undress and hold his buttocks apart for a search. Green told Chris he did not feel comfortable undressing, but Chris explained it was LEH policy to conduct such a search because there were "a lot of drug addicts" in the hospital, and Chris needed to make sure Green did not have any drugs or contraband. When Green undressed, the other patient in the room was awake and could see him, and the door to the hallway was open, allowing those in the hallway to see into the room. Green alleged the strip search was not mandatory, and Dr. Suzuki or another more senior staff member could have waived the requirement.

Shortly after the strip search, a member of the LEH staff named James informed Green he needed to provide a urine sample for a drug test. While Green urinated into a cup, James

4

watched him.  James did not provide Green with a consent form to sign until after Green had given the sample.

Early the following morning, on March 14, Green could not sleep due to pain and anxiety.  He requested his prescription medications from the nurses' station, but the nurses told him they could not help because it was time for a shift change.  While Green remained in the hallway, he heard the nurses laughing and discussing the results of his drug test.  One nurse stated, "'Oh yeah, looks like he's positive for oxycodone and benzos . . . wow, and morphine and amphetamines too!'"  Another patient who had overheard the nurses approached Green and stated, "'I was addicted to Oxy[c]ontin too, just like you! . . .  What else do you like to take to get high?'"  Green responded his medications were legally prescribed.

Later that morning Green again approached the nurses' station and requested his medications.  The pharmacist read off a list of medications for Green, but she omitted his prescriptions for Adderall, Synthroid, famotidine, and oxycodone.  The pharmacist told Green these medications were not in stock and were not available.  Green believed this was false.  The pharmacist told Green that Dr. Suzuki would have to order the medications.  Green requested the pharmacist or Dr. Suzuki contact his physicians as soon as possible to confirm his prescriptions.  A half hour later, the pharmacist informed Green she had reached the on-call physician, who ordered Norco for pain relief.  Green alleged Norco was not the equivalent of his usual medication of oxycodone, which Dr. Suzuki had ordered be discontinued.  Due to the substitution of Norco for oxycodone, Green experienced severe pain, nausea, and other symptoms of withdrawal.

Later on March 14 staff members led Green and other patients outside to an enclosed area. Green was the only nonsmoker to go outside with the group. While outside, another patient blew smoke in Green's face. Green later had an asthma attack. Further, his clothes smelled of smoke, but he was not given a change of clothes or allowed to shower.

Later that day Green requested to use his cell phone. The nurse told Green he was not allowed to have his cell phone and he would need Dr. Suzuki to order an exception. Green requested a consultation with Dr. Suzuki. In the late evening, Dr. Suzuki saw Green. Dr. Suzuki told Green he could not authorize Green to use his cell phone, but Green could retrieve phone numbers from his phone to call using the unit phone. Green told Dr. Suzuki he was suffering from pain and "having new pain that he recognized as an incipient gout attack." Green requested his medications and a low-purine diet. During the course of his treatment at LEH, Green saw Dr. Suzuki on two more occasions. Dr. Suzuki never refilled Green's medication or met his dietary requests.

Green was not allowed to access his cell phone until the next day. When Green checked his phone, he saw he had missed multiple text messages and voicemails, but he was not allowed to check the notifications because he was only allowed to write down phone numbers from his contact list. Green had to use a pay phone in the unit hallway to make phone calls, which was only operable during certain times of day, and he often had to wait for another patient to finish a call. Green alleged that requiring him to use the pay phone violated his right to confidentiality because it forced him to disclose the pay phone number to the people he called, which revealed he was a patient in a psychiatric hospital.

6

Green alleged Dr. Suzuki's conduct violated Green's right to privacy (42 C.F.R., § 482.13(c)(1)); to receive care in a safe setting (*id.*, § 482.13(c)(2)); to be free from abuse and harassment (*id.*, § 482.13(c)(3)); to confidentiality of his clinical records (*id.*, §§ 482.13(d)(1), 482.24(b)(3)); to have his own physician notified promptly of his admission to the hospital (*id.*, § 482.13(b)(4)); to a menu that met his needs (*id.*, § 482.28(b)(1)); to keep and use his own personal possessions (Welf. & Inst. Code, § 5325, subd. (a)); to have reasonable access to telephones to make and receive confidential calls (*id.*, § 5325, subd. (d)); to dignity, privacy, and humane care (*id.*, § 5325.1, subd. (b)); to be free from harm, including isolation, abuse, and neglect (*id.*, § 5325.1, subd. (c)); to receive prompt medical care and treatment (*id.*, § 5325.1, subd. (d)); to physical exercise and recreational opportunities (*id.*, § 5325.1, subd. (h)); to nourishment and between-meal feedings (Cal. Code Regs., tit. 22, § 71243, subd. (a)(3)); to his food preferences and dietary needs (*id.*, § 71243, subds. (a)(4), (f), (g)(4), (h), (i)(1) & (2)); to his prescribed medications (*id.*, § 71233); and to privacy in patient rooms and bathrooms (*id.*, § 71619).

Green was discharged from LEH on March 16, 2014. Green lost business and missed business development opportunities from being unable to access his cell phone during his confinement. Further, Green's experience at LEH traumatized him.

Green alleged Dr. Suzuki was professionally negligent[3] in waiting an unreasonable amount of time to see him (nearly

---

[3]     Each cause of action alleged conduct by Dr. Suzuki but sought to hold Dr. Suzuki and SMPA liable for the conduct.

24 hours); failing to provide Green's prescribed medications; curtailing Green's access to his cell phone; failing to treat Green's pain, gout, insomnia, and sleep apnea; and failing to ensure the accuracy of the information in Green's chart. Green alleged his injuries from Dr. Suzuki's conduct caused him to be permanently disabled.

As to his cause of action for dependent adult abuse and neglect, Green alleged Dr. Suzuki failed to meet Green's physical and mental health needs; failed to provide Green with food and clothing; failed to protect Green from health and safety hazards; and isolated Green by not allowing him access to his cell phone. With respect to his cause of action for intentional infliction of emotional distress, Green alleged Dr. Suzuki "ignored [Green]'s requests for medication for pain, sleep, gastric reflux, and thyroid disease, even though they saw that [Green]'s lack of proper medical care was causing [him] severe emotional and physical pain." Green alleged Dr. Suzuki's professionally negligent conduct was "done with the intent to cause severe emotional distress, or with reckless disregard of the probability of causing [Green] severe emotional distress."

B.    *Dr. Suzuki and SMPA's Motion for Summary Judgment*
On December 8, 2017 Dr. Suzuki and SMPA moved for summary judgment, setting a hearing date for February 23, 2018. They argued Dr. Suzuki's conduct in treating Green was within the standard of care for a treating psychiatrist. Further, Dr. Suzuki's actions did not cause Green's injuries. SMPA asserted it could not be liable absent liability of Dr. Suzuki.

Dr. Suzuki and SMPA filed a declaration from a doctor certified in forensic psychiatry, Robert Linden, M.D. Dr. Linden

opined that based on his review of Green's March 2014 treatment records at LEH, Dr. Suzuki "met the standard of care for a psychiatrist in all respects in the care and treatment provided to Mr. Green." Dr. Linden opined Green's "medications were changed appropriately" and "it is within the standard of care to substitute Norco for Oxycodone." Dr. Linden averred a body search of a patient admitted on a section 5150 hold is within the standard of care to ensure the patient is not in possession of illicit substances or objects that could be used for self-harm. That Dr. Suzuki saw Green within 24 hours of admission was within the standard of care. It was "further within the standard of care to consider a [section] 5150 patient's cell phone a contraband item," and a cell phone was contraindicated for a patient such as Green experiencing symptoms of a manic episode. It was also within the standard of care for Dr. Suzuki to rely on family medicine specialist Dr. Philip Zhuo's assessment of Green's "physical pain and maladies." Dr. Linden opined Green's documented use of the unit telephone multiple times on March 14 and 15 provided Green sufficient access and was reasonable and within the standard of care. Further, Green's records showed he requested a regular diet, not a low-purine diet. Finally, the practice of sharing outdoor recreation space between smoking and non-smoking patients did not fall below the standard of care.

Dr. Linden further opined "to a reasonable degree of medical probability that there is nothing that Dr. Suzuki did or failed to do in violation of the standard of care that caused or contributed to any injury alleged by plaintiff." Dr. Linden continued, "[a]ny failure to provide a low-purine diet at LEH did not cause plaintiff any injury. . . . The effect of following (or not following) a low purine diet would take weeks to manifest, so not

9

following such a diet for three days would have little to no effect on plaintiff's gout." Further, "[t]he failure to take Synthroid for three days would likewise not cause plaintiff to suffer any pain or complications. There are further no indications in the records that [Green] suffered any thyroid issues during his three day hospitalization. Thus, to a reasonable degree of medical probability, any failure to prescribe Synthroid did not cause [Green] any damage." In addition, "[t]here would be no negative clinical impact if he did not have Adderall, Synthroid, or Famotidine (Pepcid) for three days . . . . Adderall is further a stimulant and would be relatively contraindicated when there is a concern that the patient is in a manic episode." Green was prescribed Norco and baclofen, but the baclofen "was never administered, indicating that [Green] did not have severe pain."

Dr. Suzuki and SMPA also filed a declaration by Dr. Suzuki, in which he averred he is a practicing psychiatrist, the medical director of LEH, and a partner at SMPA. Dr. Suzuki stated it was LEH's policy for each new patient admitted on a section 5150 hold to undergo "a skin integrity check to determine that he or she did not bring any contraband into the facility and that they did not have any wounds that needed attention." Dr. Suzuki explained this was not a body cavity search, but rather, "the new patient is asked to remove their clothing and spread their legs apart," and the patient's "buttock cheeks are not violated by the staff." Dr. Suzuki stated, "Standard protocol also requires that each patient provide a monitored urine sample upon admission" to "ensure the authenticity of the sample." Dr. Suzuki averred he did not conduct the skin integrity check or urine sample collection for Green and "did not authorize either of these procedures to be performed in a manner outside protocol."

10

Further, Dr. Suzuki "did not authorize . . . any disclosure of Mr. Green's medical information to other patients."

Dr. Suzuki declared, "The patients are welcome to shower at any time." Cell phones with cameras are not permitted in the unit "due to concerns over patients being able to take pictures of other patients." According to Dr. Suzuki, Green's alleged complaints of unmet medical and dietary needs would have been recorded in Green's records, but the records contained no such complaints.

Dr. Suzuki averred he "never intended to injure or cause [Green] any physical or emotional harm." He explained, "For each patient that I see at LEH, I endeavor to provide the psychiatric care that I believe will best help them, given their psychiatric history. I honestly and in good faith believe I provided appropriate care to [Green] consistent with this custom and practice." Dr. Suzuki continued, "I was not aware and in good faith do not believe that any staff member at LEH intentionally or purposefully failed to provide necessary medical or psychiatric care to Mr. Green. [¶] . . . I was not aware and do not believe that any staff member, or owner, maintainer, manager or operator, of LEH intentionally engaged in conduct to cause substantial harm to plaintiff." Dr. Suzuki stated he did not intend to isolate Green during his hospitalization. Dr. Suzuki believed his psychiatric medication prescriptions for Green were appropriate and "any physical pain or condition would be or were being addressed by the family medicine specialist," who customarily handled patients' medical needs. Dr. Suzuki continued, "physical pain and medical ailments are not within my purview as the attending psychiatrist."

11

Dr. Suzuki and SMPA attached what they identified as "pertinent portions" of Green's medical records, including excerpts of records documenting Green's treatment at LEH.[4]

C.      *Green's Opposition to the Motion for Summary Judgment and Multiple Continuances of the Motion*

On February 21, 2018, on its own motion, the trial court continued the hearing on Dr. Suzuki and SMPA's summary judgment motion to March 29, 2018 due to staffing issues.  On March 29 Green filed an ex parte application to continue the motion again because Green was seeking to obtain new counsel to

---

[4]      Two days before oral argument (on February 2, 2022) Green filed a motion to seal portions of the record on appeal (including Green's medical records attached to Linden's declaration and pleadings referencing the records) and to strike the respondents' brief.  On February 22, 2022 Green filed an "amended and superseding emergency motion" for similar relief. Green's first motion to seal, filed almost two years after he filed his March 23, 2020 motion to augment the record (submitting most of the documents he now asserts should be sealed), is untimely.  Further, because the documents are publicly available in the trial court, Green cannot meet his burden under California Rules of Court, rule 2.550(d) to show there is an overriding interest in sealing the documents.  (See also Cal. Rules of Court, rule 8.46(c) ["A record filed or lodged publicly in the trial court and not ordered sealed by that court must not be filed under seal in the reviewing court."].)  Accordingly, the amended and superseding emergency motion is denied.  Green's motion to file supplemental pleadings, filed on the day of oral argument, is denied as untimely.

12

represent him in the matter.[5]  The trial court granted the application and continued the hearing to July 27, 2018.

On July 20, 2018 Green filed an opposition to Dr. Suzuki and SMPA's summary judgment motion.  Green argued Dr. Suzuki and SMPA failed to carry their burden to show Green could not establish an element of his causes of action because the declarations of Drs. Linden and Suzuki were not admissible, competent evidence.  Green further argued triable issues of fact existed based on the declaration of Dr. Daniel Fast, Green's treating psychiatrist and expert witness.  Green's statement of facts referred to a declaration of Dr. Fast, but no declarations were submitted with the opposition papers.  Green also filed 116 evidentiary objections asserting boilerplate objections to the declarations of Drs. Linden and Suzuki.

On July 26 Green filed an ex parte application to continue the summary judgment motion, attaching a two-page letter from Dr. Fast signed under penalty of perjury.  Dr. Fast did not provide his qualifications (other than he is an "M.D."), and he acknowledged he had not "review[ed] a copy of the hospital medical record."  However, Dr. Fast noted that Dr. Suzuki failed to coordinate Green's discharge with Dr. Fast, and instead Dr. Fast learned from Green that he had been discharged.  Further, Dr. Fast recounted that in Green's sessions with him, Green "alluded to the intrusive and emotionally traumatic nature of the strip search."  Dr. Fast added that Dr. Linden did not testify at his deposition about the interaction between Green and the person who performed the strip search or Green's reaction to

---

[5]     On November 3, 2017 the trial court granted a motion filed by Green's attorney, Gary S. Brown, to be relieved as counsel.

13

it, and "[i]t appears that there was no follow up evaluation or care by the staff or Dr. Suzuki of Mr. Green's intense negative emotional reaction to his procedure, no matter how well indicated." Dr. Fast opined "the care rendered to [Green] under the direction of Dr. Suzuki fell below the usual inpatient psychiatric standard of care, resulting in Acute Post Traumatic Stress Disorder." The next day the court continued the summary judgment motion to September 14, 2018.

On September 14 Green filed another ex parte application to continue the motion, requesting time to conduct additional discovery and to complete declarations by Dr. Fast and an unidentified witness. Green attached a declaration from Dr. Fast in which he stated, "I have been extremely busy . . . . I respectfully request 14 days additional time to fully review all the records in this matter, including all of [Green's] treatment records, so that I may properly complete the [d]eclaration." The trial court granted Green's application and continued the hearing to October 12, 2018.

Green failed to file any further opposition to the motion or supporting evidence.

D.    *Dr. Suzuki and SMPA's Reply on Summary Judgment*
On September 7, 2018 Dr. Suzuki and SMPA filed a reply in support of their summary judgment motion. They argued Green's July 20, 2018 opposition should be stricken as untimely and incomplete, but they also addressed the arguments Green made in the opposition. They asserted the letter declaration of Dr. Fast, which Green attached to his July 26, 2018 ex parte application for a continuance, was inadmissible and inadequate to create a triable issue of fact on Green's claims.

E.      *The Trial Court's Ruling and Entry of Judgment*

Green's attorney appeared by telephone at the October 12, 2018 hearing on the summary judgment motion and orally moved for another continuance.  Green's attorney informed the court Green intended to make "an ex parte application to shorten time to hear the renewed motion for leave to file a third amended complaint," which a friend of Green was supposed to serve on defense counsel at the hearing, although the friend did not appear.  By the time of the hearing, the ex parte application had not been served on defense counsel or filed with the court.  The court denied the request for a continuance, noting the summary judgment motion was initially set for February 2018 and had been continued four times.  The court adopted its tentative ruling granting Dr. Suzuki and SMPA's motion for summary judgment.

In its written ruling, the court found Green had failed to comply with Code of Civil Procedure section 437c, subdivision (b)(3), because his separate statement in support of his opposition did not contain any page or paragraph numbers for the two pieces of supporting evidence (Dr. Fast's purported declaration and an unidentified exhibit).[6]  As to Green's cause of action for professional negligence, the court found the undisputed evidence submitted by Dr. Suzuki and SMPA showed Green could not establish Dr. Suzuki breached the standard of care in treating Green and could not establish Green's injuries were

---

[6]      The separate statement consistently provides as to disputed facts, "(Dr. Fast Decl., ¶  ; Exh.  , pgs.  )" or, as to several facts, "(Exh. U, pg.  )."  The appellate record does not contain either a declaration from Dr. Fast or an exhibit U filed by Geen in opposition to the summary judgment motion.

15

caused by Dr. Suzuki's conduct. With respect to Green's cause of action for dependent adult abuse and neglect, the court found the undisputed evidence showed Dr. Suzuki met Green's treatment needs, lacked the requisite mental state, and did not engage in conduct that injured Green. The court found as to Green's cause of action for intentional infliction of emotional distress that the undisputed evidence showed Dr. Suzuki's conduct was within the standard of care and was not extreme and outrageous. With respect to SMPA, the court found that because Dr. Suzuki's conduct was not actionable, SMPA could not be liable for the conduct. The court did not address Green's evidentiary objections.

On November 1, 2018 the trial court entered a judgment of dismissal in favor of Dr. Suzuki and SMPA. As discussed below, Green timely appealed.

## DISCUSSION

A. *Green's Appeal Is Timely*

On November 13, 2018 Green filed a notice of intention to move for a new trial, setting a hearing date for December 7, 2018. Two days later Dr. Suzuki and SMPA served Green with notice of entry of judgment. On November 27 Green filed a memorandum of points and authorities in support of his new trial motion.

On December 7 Green did not appear at the hearing on his new trial motion. The trial court adopted its tentative ruling and denied Green's motion based in part on Green's failure to serve and file his memorandum of points and authorities within 10 days of filing his notice of intention to move for a new trial, as required by Code of Civil Procedure section 659a and California

16

Rules of Court, rule 3.1600.[7]  On the same day, Dr. Suzuki and SMPA served on Green notice of the trial court's ruling denying the new trial motion.  The notice stated, "The tentative ruling to deny plaintiff's motion for new trial was adopted as the final ruling."  (Capitalization omitted.)  Dr. Suzuki and SMPA attached to their notice a copy of the court's tentative ruling but not the court's order.

On January 14, 2019, the 60th day following Dr. Suzuki and SMPA's service of notice of entry of judgment, Green timely appealed from the judgment.  (*Green v. Signature Healthcare Services, LLC et al.,* B295164.)  But on February 4 Green abandoned the appeal.  In the meantime, on January 25 Green moved in the trial court for reconsideration of the court's order denying his new trial motion, which the court denied.  And on February 13 Green filed a motion to vacate the court's August 27, 2018 order denying him leave to file a third amended complaint, which the court later denied.[8]

On February 15, 2019 Green filed a second notice of appeal from the judgment, which initiated the present appeal.  On May 20, 2019 Dr. Suzuki and SMPA moved to dismiss the appeal as untimely.  Dr. Suzuki and SMPA argued the February 15 notice of appeal was filed 92 days after the date they served Green with the notice of entry of judgment.  They contended Green's November 13, 2018 notice of intention to move for a new trial did not extend the time to appeal because it was not a

---

[7]     All further citations to rules are to the California Rules of Court.

[8]     The record does not contain the trial court's order denying Green's motion to vacate the court's August 27, 2018 order, but it is undisputed the court denied the motion.

17

"valid" notice, as required by rule 8.108(b) because Green's new trial motion was later deemed procedurally deficient.

Green opposed the motion to dismiss, arguing rule 8.108(b) required only the filing of a valid notice of intention to move for a new trial, which he had filed. Green asserted he "actually e-filed [and served] his Notice of Appeal on February 13, 2019," but it was rejected by the superior court clerk on February 15. Green contended his notice of appeal should be deemed filed as of February 13 and thus was timely filed 90 days after Dr. Suzuki and SMPA served Green with notice of entry of judgment, based on "the 30-day extension . . . under Cal. Rules of Court, rule 8.108(b)(1)(A)." Green also argued Dr. Suzuki and SMPA's December 7, 2018 notice of ruling on Green's new trial motion was not a "notice of entry of . . . order" denying the new trial motion and thus did not trigger the 30-day extension under rule 8.108(b)(1)(A). Thus, his time to appeal was extended to 180 days after entry of judgment under rule 8.108(b)(1)(C).

On July 18, 2019 this court issued an order stating, "The court is tentatively of the view that the appeal is timely and that the motion to dismiss should be denied. . . . The issue of timeliness may be reexamined by the panel assigned to hear the merits of the appeal." In their respondents' brief, Dr. Suzuki and SMPA now contend that even if Green's notice of intention to move for a new trial was valid, his appeal is still untimely because under rule 8.108 (b)(1)(A), Green's time to appeal was extended only for 30 days from December 7, 2018—when they served on Green the notice of the trial court's ruling denying

18

Green's new trial motion—until January 7, 2019.[9] Because this would shorten the time for Green to appeal from the judgment, pursuant to rule 8.108(a), "the usual 60-day deadline" under rule 8.104(a)(1)(A) applies, and Green's appeal is untimely because the last day to appeal the judgment was January 14, 2019—60 days from Dr. Suzuki and SMPA's service of notice of entry of judgment.

Green's appeal is timely. Where a party serves notice of entry of judgment, the notice of appeal must be filed on or before "60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service," unless the superior court clerk had earlier served a notice of entry of judgment. (Rules 8.104(a)(1)(A), (B).) However, rule 8.108(b) provides, "If any party serves and files a valid notice of intention to move for a new trial, the following extensions of time apply: [¶] (1) If the motion for a new trial is denied, the time to appeal from the judgment is extended for all

---

[9] Dr. Suzuki and SMPA argued in their motion to dismiss that Green's time to appeal was not extended under rule 8.108(b) by Green's filing of his notice of intention to move for a new trial because the notice was not valid. Although Green's new trial motion was denied by the court as untimely because the motion and supporting memorandum were not filed within 10 days of filing his notice of intention to move for a new trial, it is the filing of a "valid notice of intention to move for a new trial" that triggers the time extension under rule 8.108(b). There is no authority for the proposition a timely filed notice of intention to move for a new trial is not "valid" for purposes of rule 8.108(b) because of procedural deficiencies in a subsequently filed new trial motion.

19

parties until the earliest of: [¶] (A) 30 days after the superior court clerk, or a party serves an order denying the motion or a notice of entry of that order; [¶] (B) 30 days after denial of the motion by operation of law; or [¶] (C) 180 days after entry of judgment."

Green's argument that Dr. Suzuki and SMPA's December 7, 2018 "notice of ruling" was not a "notice of entry of order" for purposes of rule 8.108(b)(1)(A) has merit. The December 7 notice gave Green notice the trial court had denied his new trial motion, but it did not notify Green of the entry of the order or attach the order. (*Carmel, Ltd. v. Tavoussi* (2009) 175 Cal.App.4th 393, 399 ["serving a notice of ruling is not the same as serving a copy of the order or a notice of entry of the order, as contemplated by the rules governing the timeliness of appeals"]; *20th Century Ins. Co. v. Superior Cour* (1994) 28 Cal.App.4th 666, 672 ["It might seem that the difference between a 'notice of ruling' and a 'notice of entry' is hypertechnical. In another context it might be."].) Because Green filed a valid notice of intention to move for a new trial and neither the superior court clerk nor Dr. Suzuki and SMPA served Green with an order denying the new trial motion or a notice of entry of such an order, Green had 180 days after entry of judgment to appeal (rule 8.108(b)(1)(C)), which he timely did.

B.     *Standard of Review on Summary Judgment*
Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); *Delgadillo v. Television Center, Inc.*

20

(2018) 20 Cal.App.5th 1078, 1085.) "'"'"We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."'" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Valdez v. Seidner-Miller, Inc., supra*, 33 Cal.App.5th at p. 607.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Valdez*, at p. 607.) We must liberally construe the opposing party's evidence and resolve any doubts about the evidence in favor of that party. (*Regents, supra*, 4 Cal.5th at p. 618; *Valdez*, at p. 608.) But "[t]he plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show . . . a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists." (Code Civ. Proc., § 437c, subd. (p)(2); accord, *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1054 ["It is fundamental that to defeat summary judgment a plaintiff must show 'specific facts' and cannot rely on allegations of the

21

complaint."]; *Regional Steel Corp. v. Liberty Surplus Ins. Corp.*
(2014) 226 Cal.App.4th 1377, 1388.)

C.      *The Trial Court Properly Admitted the Declarations of*
        *Drs. Linden and Suzuki in Ruling Dr. Suzuki and SMPA*
        *Met Their Initial Burden on Summary Judgment*

        Green contends the trial court erred in considering the
declarations of Drs. Linden and Suzuki in finding Dr. Suzuki and
SMPA carried their initial burden to show Green could not
prevail on his causes of action.  Green's primary contention is
that the declarations have no evidentiary foundation because
Dr. Suzuki and SMPA submitted only excerpts of Green's medical
records.[10]  Green cites no authority, nor is there, for the
proposition experts need to submit a patient's medical records
beyond the portions on which the experts rely.  Green's reliance
on *EHP Glendale, LLC v. County of Los Angeles* (2011) 193
Cal.App.4th 262 is misplaced.  There, a taxpayer challenging the
valuation of its property by the board of equalization presented
"only fragmentary excerpts of the administrative record" in
support of its motion for summary judgment.  (*Id.* at p. 268.)  The
Court of Appeal reversed the trial court's grant of the taxpayer's
motion, reasoning "the issue whether the Board's findings are

---

[10]      Although the trial court did not rule on Green's evidentiary
objections, they are preserved on appeal.  (See *Reid v. Google, Inc.*
(2010) 50 Cal.4th 512, 534 ["[I]f the trial court fails to rule
expressly on specific evidentiary objections, it is presumed that
the objections have been overruled, the trial court considered the
evidence in ruling on the merits of the summary judgment
motion, and the objections are preserved on appeal."].)

supported by substantial evidence presupposes that the trial court has before it *all* the evidence considered by the Board in making its assessment." (*Id.* at p. 272.) Green's suit does not involve an administrative record, nor did the experts fail to present the documents on which they relied.

*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, also relied on by Green, does not support his position. In *Serri,* the Court of Appeal affirmed the trial court's ruling sustaining an employer's evidentiary objections to handwritten notes the plaintiff submitted in opposition to the employer's summary judgment motion because the plaintiff provided no evidence to support her claim the notes were authored by the employer's vice-president of human resources. (*Id.* at pp. 839, 855.) Here, Green has failed to demonstrate the medical records submitted in support of the declarations of Drs. Linden and Suzuki were not properly authenticated. To the contrary, Dr. Suzuki and SMPA submitted a verification from an agent of LEH confirming the authenticity of Green's records and a declaration from LEH's custodian of records attesting the medical records were prepared by LEH's personnel in the ordinary course of business.

Green also requests this court "review and rule upon" the 116 evidentiary objections he raised in the trial court, but he has provided no analysis or citation to authority regarding his evidentiary objections. Thus, he has forfeited these objections.[11]

---

[11] We acknowledge a self-represented litigant's understanding of the rules on appeal are, as a practical matter, more limited than an experienced appellate attorney's. Whenever possible, we do not strictly apply technical rules of procedure in a manner that deprives litigants of a hearing. But we are required to apply the rules on appeal and substantive rules of law to a self-

(See *Cohen v. Kabbalah Centre Internat., Inc.* (2019)
35 Cal.App.5th 13, 21 [declining on appeal to review trial court's
implied rulings on "scores of objections" where appellant failed to
describe why any were "'critical in resolving the summary
judgment motion'"]; see also *People v. Bryant, Smith and Wheeler*
(2014) 60 Cal.4th 335, 363 ["If a party's briefs do not provide legal
argument and citation to authority on each point raised, "'the
court may treat it as waived, and pass it without
consideration.'"']; *Roe v. McDonald's Corp.* (2005)
129 Cal.App.4th 1107, 1114 ["'[a]n issue merely raised by a party
without any argument or authority is deemed to be without
foundation and requires no discussion'"].)

D. *Dr. Suzuki and SMPA Carried Their Initial Burden, and*
   *Green Failed To Raise a Triable Issue of Fact as to His*
   *Causes of Action*
   1. *Green's cause of action for professional negligence*
      *against Dr. Suzuki*

"The elements of a claim for professional negligence are
"'(1) the duty of the professional to use such skill, prudence, and
diligence as other members of his profession commonly possess
and exercise; (2) a breach of that duty; (3) a proximate causal
connection between the negligent conduct and the resulting
injury; and (4) actual loss or damage resulting from the
professional's negligence.'"' (*Paul v. Patton* (2015)
235 Cal.App.4th 1088, 1095; accord, *Powell v. Kleinman* (2007)
151 Cal.App.4th 112, 122.) "Medical providers must exercise that

represented litigant's claims on appeal just as we would to those
litigants who are represented by trained legal counsel.
(*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984-985.)

degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances." (*Powell*, at p. 122; accord, *Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 108, fn. 1.) "'In professional malpractice cases, expert opinion testimony is required to prove or disprove that the defendant performed in accordance with the prevailing standard of care [citation], except in cases where the negligence is obvious to laymen.'" (*Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 644-645; accord, *Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 288.)

Green contends Dr. Suzuki and SMPA did not carry their initial burden on summary judgment because the evidence proffered in support of their motion does not fully address the allegations in his corrected second amended complaint. We are not persuaded. Dr. Linden opined "to a reasonable medical probability, that Dr. Suzuki met the standard of care for a psychiatrist in all respects in the care and treatment provided to Mr. Green" and Dr. Suzuki's conduct did not cause Green's alleged injuries. Dr. Linden opined the changes to Green's medications made by LEH personnel were proper, and Dr. Suzuki was entitled to rely on the decisions made by Dr. Zhuo regarding Green's physical health needs. Dr. Linden also opined the monitored collection of a urine sample, the sharing of outdoor recreation space between smoking and non-smoking patients, and the confiscation of Green's cell phone were all within the standard of care for a patient in Green's position. Further, it was within the standard of care for Dr. Suzuki to rely on Green's medical records, which did not reflect a request by Green for a low-purine diet. And Dr. Suzuki declared he was not responsible for the alleged actions by LEH personnel in disclosing Green's

25

private medical information (by the nurses talking in the hallway).

Green points to the allegation in the operative complaint that mental health worker Chris performed a strip search on Green in front of another patient and with the door ajar. However, Dr. Linden declared a skin integrity check (what Green calls a strip search) was within the standard of care, and Dr. Suzuki averred he was not responsible for the manner in which LEH personnel (Chris) performed the check.

Green also asserts Dr. Suzuki and SMPA failed to address the allegation in the operative complaint that Dr. Suzuki failed to accurately record all necessary information on Green's chart. But Dr. Suzuki averred he followed "custom and practice to only chart a patient's concerns if they became a major issue."

Green also contends in a conclusory manner that Dr. Suzuki and SMPA did not address Green's allegations in the operative complaint that Dr. Suzuki violated "statutes and regulations," constituting negligence per se. But, as discussed, Dr. Suzuki and SMPA carried their burden to show Dr. Suzuki's conduct was within the standard of care. And in his opening brief, Green has not identified any other conduct by Dr. Suzuki that Green asserts violated a statute or regulation.

Further, even if Dr. Suzuki had violated a statute or regulation, Dr. Linden presented his expert testimony that Dr. Suzuki's conduct did not cause Green's injuries. "'The negligence per se doctrine, as codified in Evidence Code section 669, creates a presumption of negligence if four elements are established: "(1) the [party opposing a finding of negligence per se] violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to

26

person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.'""" (*Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263-264; accord, *Haytasingh v. City of San Diego* (2021) 66 Cal.App.5th 429, 468 ["Negligence per se is an evidentiary doctrine codified at Evidence Code section 669 that provides for the application of a rebuttable presumption that a breach of the legal duty of due care has occurred where there has been a violation of a statute, ordinance or regulation."].)

Thus, Dr. Linden's testimony that Dr. Suzuki's conduct did not cause Green's injuries is a sufficient showing to shift the burden to Green to raise a triable issue of fact. In response, Green has not shown how the asserted violation proximately caused injury to him, and he cannot rely on the allegations in his pleadings to show a triable issue of fact exists. (Code Civ. Proc., § 437c, subd. (p)(2); see *Roman v. BRE Properties, Inc., supra*, 237 Cal.App.4th at p. 1054.)

Finally, Green argues the opinions of Dr. Fast contained in his two-page letter declaration filed as an attachment to Green's July 26, 2018 ex parte application to continue the summary judgment motion create a triable issue of fact. But "[m]aterial not presented in opposition to the summary judgment motion itself is not properly considered by the court in ruling on the motion." (*Roman v. BRE Properties, Inc., supra*, 237 Cal.App.4th at p. 1054 [information in plaintiffs' fee waiver request and requests for accommodation in the trial court did not create triable issue on summary judgment].) Moreover, although

27

Dr. Fast expressed his opinion in the letter that the care provided by Dr. Suzuki to Green "fell below the usual inpatient psychiatric standard of care," his declaration lacks foundation because he acknowledged he had not reviewed Green's medical records.[12] The letter therefore does not create a triable issue of fact as to Green's claim for professional negligence.

    2.    *Green's cause of action for intentional infliction of emotional distress against Dr. Suzuki*

"A cause of action for intentional infliction of emotional distress exists when there is ""'"(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."'"" [Citations.] A defendant's conduct is 'outrageous' when it is so ""extreme as to exceed all bounds of that usually tolerated in a civilized community."'" [Citation.] And the defendant's conduct must be ""'intended to inflict injury or engaged in with the realization that injury will result."'"" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051; accord, *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1109, aff'd (2021) 11 Cal.5th 204.)

---

[12] We reject Green's argument Dr. Suzuki and SMPA forfeited any evidentiary challenge to Dr. Fast's declaration. In their reply in support of their summary judgment motion, Dr. Suzuki and SMPA asserted the letter declaration of Dr. Fast was inadmissible and inadequate to create a triable issue of fact on Green's claims.

Dr. Suzuki and SMPA carried their burden to show Green could not prevail on his cause of action for intentional infliction of emotional distress. As discussed, Dr. Linden opined that Dr. Suzuki's care and psychiatric treatment of Green to a reasonable medical probability was within the standard of care. And Dr. Suzuki averred in his declaration that he did not intend to cause Green physical or emotional harm, but rather, sought to provide him with appropriate psychiatric care. Green disputes Dr. Suzuki's statement that the care he provided to Green was not intended to harm Green, but Green failed to present any evidence disputing this in opposition to the summary judgment motion. On appeal, Green simply asserts he "certainly disputes that statement." And, as discussed, Green cannot rely on the allegations of his operative complaint to create a triable issue. Finally, Green has not presented any evidence to rebut the opinion of Dr. Linden in his declaration that Dr. Suzuki's conduct did not cause Green's injuries. Thus, Green failed to raise a triable issue of fact on his cause of action for intentional infliction of emotional distress against Dr. Suzuki.

3.     *Green's cause of action for dependent adult abuse and neglect against Dr. Suzuki*

To establish a claim for neglect of a dependent adult, "a plaintiff 'must allege (and ultimately prove by clear and convincing evidence) facts establishing that the defendant (1) had responsibility for meeting the basic needs of the elder or dependent adult, such as nutrition, hydration, hygiene or medical care [citations]; (2) knew of conditions that made the elder or dependent adult unable to provide for his or her own basic needs [citations]; and (3) denied or withheld goods or services necessary

to meet the elder or dependent adult's basic needs, either with knowledge that injury was substantially certain to befall the elder or dependent adult (if the plaintiff alleges oppression, fraud or malice) or with conscious disregard of the high probability of such injury (if the plaintiff alleges recklessness) [citations]. The plaintiff must also allege (and ultimately prove by clear and convincing evidence) that the neglect caused the elder or dependent adult to suffer physical harm, pain or mental suffering.'" (*Dougherty v. Roseville Heritage Partners* (2020) 47 Cal.App.5th 93, 105, fn. 1; accord, *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 406-407.) "As used in the Act, neglect refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.] Thus, the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care. [Citation.] Notably, the other forms of abuse, as defined in the Act—physical abuse and fiduciary abuse (§ 15657)—are forms of intentional wrongdoing also distinct from 'professional negligence.'" (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 783; accord, *Delaney v. Baker* (1999) 20 Cal.4th 23, 34.)

Dr. Suzuki and SMPA carried their burden to show Green could not prevail on his claim for dependent adult abuse and neglect. As discussed, Drs. Linden and Suzuki provided declarations showing that Dr. Suzuki provided psychiatric care for Green within the standard of care. With respect to the allegations in the operative complaint, as stated by Dr. Linden,

Green was given access to a phone at LEH free of charge, which Green used multiple times during his treatment. Dr. Suzuki averred patients are free to shower at any time. With regard to the alleged failure to provide Green with his prescribed medications, Drs. Linden and Suzuki opined it was appropriate for Dr. Suzuki to rely on Dr. Zhuo's treatment of Green's physical health needs. As to the alleged failure to provide Green with a low-purine diet, Dr. Linden found there was no record of Green requesting such a diet, and Dr. Suzuki declared the diet would have been provided if requested. And, as noted, Dr. Linden opined that Dr. Suzuki's conduct did not cause Green's injuries. Green did not present any evidence to rebut this showing, instead relying on the allegations in his operative complaint. On appeal, Green only argues that Dr. Suzuki's own declaration was not sufficient to meet his burden. Thus, Green failed to raise a triable issue of fact on his cause of action for dependent adult abuse and neglect against Dr. Suzuki.

> 4. *Green failed to raise a triable issue of fact as to his causes of action against SMPA*

"There can be no vicarious liability in a medical malpractice action without the underlying liability of the medical practitioner." (*Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1426; accord, *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347.) Because Green failed to raise a triable of issue of fact as to his causes of

31

action against Dr. Suzuki, there is no basis for liability as to SMPA.[13]

E.    *The Trial Court Did Not Abuse Its Discretion in Denying Green Leave To File a Third Amended Complaint*

1.    *Proceedings below*

On July 6, 2018 Green filed a motion for leave to file a third amended complaint, seeking to allege additional causes of action against Dr. Suzuki and SMPA for violations of Civil Code sections 51 (Unruh Civil Rights Act) and 52.1 (Tom Bane Civil Rights Act).[14]  Green set the hearing for July 27.  Dr. Suzuki and SMPA filed an objection to Green's motion, arguing Green had not provided sufficient statutory notice because Green's motion was not served at least 16 court days before the hearing (Code Civ. Proc., § 1005, subd. (b)), plus five calendar days for mailing

---

[13]    We reject Green's assertion the trial court erred in not granting the oral request for a continuance of the summary judgment motion made by Green's attorney at the October 12, 2018 hearing.  Green has forfeited this contention by presenting no legal argument or authority for his argument.  (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 363; *Roe v. McDonald's Corp., supra*, 129 Cal.App.4th at p. 1114.)  Moreover, even if Green had not forfeited this argument, the trial court did not abuse its discretion in denying Green's oral request for a fifth continuance of the summary judgment motion, where the court had provided multiple continuances for the same purpose (to allow Green to conduct discovery and submit Dr. Fast's completed declaration and other evidence) and Green made no good faith showing by affidavit that a continuance was necessary. (See *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 576.)

[14]    Green also sought leave to amend to assert a cause of action for assault against other defendants.

32

(*id.*, § 1013, subd. (a)).  On July 27 the court denied Green's motion based on untimely filing and service.

     2.     *The trial court did not abuse its discretion*

"It is well established that leave to amend a complaint is entrusted to the sound discretion of the trial court, and that the exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse of discretion." (*McMillin v. Eare* (2021) 70 Cal.App.5th 893, 909; accord, *Graphic Arts Mutual Ins. Co. v. Time Travel Internat., Inc.* (2005) 126 Cal.App.4th 405, 410 ["We apply the abuse of discretion standard when reviewing the trial court's denial of leave to amend."].)  The appellant bears the burden of proving the trial court abused its discretion in denying leave to amend.  (*Graphic Arts*, at p. 410.)

Green has not shown the trial court abused its discretion in denying his procedurally defective motion for leave to file a third amended complaint.  Here too, Green has failed to present legal argument or to cite to authority to explain how the trial court abused its discretion, thus forfeiting the contention.  (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 ["'[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.'"]; *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457 [plaintiffs forfeited claim of error by failing to "present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error"].)

Even if Green had not forfeited this argument, the trial court did not abuse its discretion.  Green's motion for leave to file a third amended complaint failed to comply with Code of Civil

Procedure section 1005, subdivision (b), which provides, "Unless otherwise ordered or specifically provided by law, all moving and supporting papers shall be served and filed at least 16 court days before the hearing."  Green filed his motion on July 6, 2018, only 15 court days before the July 27 hearing.  Further, Green served his motion by mail on July 5, 2018, which was 16 court days before the hearing, without complying with Code of Civil Procedure section 1013, subdivision (a), which provides in case of service by mail that "any period of notice . . . shall be extended five calendar days."  Thus, the trial court did not abuse its discretion in denying Green's motion based on untimely filing and service.[15]

---

[15]    Green also contends the trial court erred in denying his February 13, 2019 motion to vacate the court's denial of his motion for leave to file a third amended complaint, but he has forfeited this claim for failing to provide a complete appellate record containing the trial court's ruling on the motion.  (*Mack v. All Counties Trustee Services, Inc.* (2018) 26 Cal.App.5th 935, 940 [""Failure to provide an adequate record on an issue requires that the issue be resolved against appellant.""]; accord, *Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348 ["By failing to provide an adequate record, appellant cannot meet his burden to show error and we must resolve any challenge to the order against him."].)

## DISPOSITION

We affirm the judgment.  Respondents are entitled to recover their costs on appeal.


FEUER, J.

We concur:


SEGAL, Acting P. J.


WISE, J.*

---

*        Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.